```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRANSITION INVESTMENTS, INC.,                    :
                                                 :
                        Plaitniff,               :
                                                 :
        - against -                              :      11 Civ. 4775 (PAC)
                                                 :
THE ALLEN O. DRAGGE, JR. FAMILY                  :      OPINION & ORDER
TRUST, ALLEN O. DRAGGE, JR.,                     :
DANA ICAZA, JOHN DOES (1-10), JANE               :
DOES (1-10), AND JOHN/JANE DOE                   :
TRUSTS (1-10)                                    :
                                                 :
                        Defendants.              :
------------------------------------------------------------------X
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 21, 2011
```

HONORABLE PAUL A. CROTTY, United States District Judge:

On June 10, 2011, Plaintiff Transition Investments, Inc. ("Plaintiff") brought this action against The Allen O. Dragge, Jr. Family Trust, Allen O. Dragge, Jr. ("Dragge"), Dana Icaza ("Icaza"), John Does (1-10), Jane Does (1-10), and John/Jane Doe Trusts (1-10) (collectively, the "Defendants") in New York Supreme Court, New York County. Plaintiff asserts claims under New York law for breach of contract, quantum meruit, and unjust enrichment.

On July 11, 2011, Dragge and The Allen O. Dragge, Jr. Family Trust (the "Dragge Defendants") removed this action to this Court, pursuant to 28 U.S.C. §§ 1332(a) and 1441, et seq., on the basis of diversity jurisdiction. The Dragge Defendants claimed that Icaza, a New York resident who would destroy diversity jurisdiction, was fraudulently joined to defeat diversity.

On August 19, 2011, Plaintiff moved to remand to state court, pursuant to 28 U.S.C. §§ 1441(b), 1446, and 1447(c), based on the absence of diversity. Icaza

simultaneously moved to dismiss Plaintiff's claims against her, pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff opposes Icaza's motion to dismiss; and Icaza and the Dragge Defendants oppose Plaintiff's motion to remand. The motions are fully briefed.

For the reasons that follow, the Plaintiff's motion for remand is DENIED and Icaza's motion to dismiss is GRANTED.

## I.  BACKGROUND

All individual Defendants are descendants of A.O. Smith. Until 2008, Defendants collectively owned—either directly or through their family trusts—a controlling interest in the shares of Smith Investment Company ("SMIC"), which owned approximately 8 million Class A and 1.5 million Common shares of A.O. Smith Corporation ("AO Smith"). (Compl. ¶¶ 9-10.)

In early 2006, Dragge approached Gary Lutin ("Lutin"), Plaintiff's President, seeking advice on how to best enhance the liquidity and value of Dragge's interests in SMIC. (Compl. ¶ 16.) On March 13, 2006, Dragge engaged Plaintiff to conduct an exploratory review and give advice regarding potential value enhancement opportunities. (Compl. ¶ 17.) Their agreement (the "2006 Engagement") was memorialized in an email from Lutin to Dragge. (Compl. Ex. A.) On or around April 19, 2006, while Plaintiff was conducting its exploratory review, Lutin met with Icaza, Dragge's niece. (Compl. Ex. D.) During their dinner, Lutin told Icaza that Plaintiff's 2006 Engagement was limited in nature and that any continued work would proceed under a second engagement, for which Plaintiff expected to be compensated at a rate of 2% annual fee based on the amount of the managed funds, plus 20% increase in the value of assets under management. (August 18, 2011 Declaration of Gary Lutin ("Lutin Decl.") ¶ 12.) Plaintiff alleges that Icaza

understood that Plaintiff would not work for free and that Icaza would have to compensate Plaintiff, particularly if she benefited from Plaintiff's work and Dragge did not fully compensate Plaintiff.  (Lutin Decl. ¶ 15.)  On April 24, 2006, Icaza emailed Lutin, thanking him for "explain[ing] to [her] what the situation at hand is and next steps on how to improve/grow [their] Investments."  (Compl. Ex. D.)  The 2006 Engagement culminated with Plaintiff's 2006 Report, which outlined the "bare bones" of its plan to increase shareholder value.  (Lutin Decl. ¶ 18.)  By June 5, 2006, Plaintiff had been paid for its work under the 2006 Engagement.  (Compl. ¶ 27.)

On May 17, 2006, Dragge notified Icaza and all other Smith family member that he had asked Plaintiff to continue working on its plan.  (Compl. Ex G.)  Plaintiff's "Plan" involved changing the trusteeship of the Smith family trusts so that Dragge would control the trusts' votes through new trustees, who would work towards increasing shareholder value.  (Lutin Decl. ¶ 18.)  If enough trusts changed trustees and acted together, they would be able to replace the current board of directors.  (Lutin Decl. ¶ 19.)  To implement its Plan, Plaintiff advised and assisted Dragge and Icaza with interviewing potential replacement trustees, transitioning co-trusteeship and administration of the Smith family trusts to a new trustee, and by communicating with Smith family members and decision makers at SMIC.  (Lutin Decl. ¶ 24; Compl. ¶ 32.)  Plaintiff also suggested that Defendants establish a Smith Investor Association, of which Lutin would be the director, to share costs and benefits of managing investments in SMIC.  (Lutin Decl. ¶ 20; Compl. ¶ 48, Ex. M.)

Icaza became the family "information gathering delegate" in implementing the Plan. (Lutin Decl. ¶ 25.) Lutin sought to assist Icaza in this role, as reflected by an April 27, 2006 email to U.S. Trusts—a potential new trustee—where Lutin wrote:

> "The family information-gathering delegate is expected to be Dana Icaza. . . . I'd like to send her some introductory literature and then arrange a meeting for some time later next week or the following week. I'm not actually involved in the family trust aspect of this, of course, but wanted to extend any courtesy that will help these people realize the full value of their investments."

(Lutin Decl. Ex. B.)

A year and a half later, in September 2007, Plaintiff sent Dragge a draft engagement letter reflecting the terms of their second engagement (the "2007 Engagement") involving Plaintiff's continued work on its Plan. (Compl. ¶ 34.) After several revised drafts, Plaintiff emailed Dragge a "Final form of letter," dated October 26, 2007. (See Compl. ¶ 39, Ex. J) The 2007 Engagement was addressed to Dragge and was not signed by either Dragge or Lutin. (See Compl. Ex. J.) The 2007 Engagement letter stated, in part:

> At least for now, you [Dragge], individually, will be the person I [Plaintiff] advise. But I will accept any reasonable request to add trusts or other entities for which you're responsible, and will also consider the addition of any other Smith shareholders recommended or approved by you. Ideally, of course, it should be Smith itself that I am advising in relation to the enhancement of value to benefit all the corporation's shareholders. My responsibility, though, will be to advise only those with whom I have an agreement. I will have no responsibility to serve the interests of anyone I have not specifically agreed to advise.

(Compl. Ex. J.) The 2007 Engagement (Compl. Ex. J) set forth Plaintiff's compensation and reflected that "both [Dragge and Lutin] have to assume risk" because it was in both their interests to have all SMIC shareholders contribute to Plaintiff's expenses pro-rata, based on the value of their trusts enhancement. Otherwise, Dragge would be "effectively

4

penalized by the amount of costs [he] incur[red] relative to the 'free riders.'" Plaintiff's compensation included a monthly retainer and, if the plan was acceptable, either a right to buy SMIC shares or an acceptable alternative of equivalent value. Dragge did not raise any objection to the 2007 Engagement, and starting paying Plaintiff its monthly retainer. (Compl. ¶¶ 44-45.)

On January 7, 2008, Plaintiff assisted Dragge in formulating a 'pitch' to the Smith family trust members to introduce Morgan Stanley as a new trust administrator. (Compl. ¶ 49.) On February 3, 2008, Dragge told Plaintiff that they "won" and promised to seek reimbursement from SMIC for his expenses incurred on behalf of all shareholders, which would include Plaintiff's compensation. (Compl. ¶¶ 60, 61.) Plaintiff does not allege that a Smith Investor Association was ever formed. Around this time, Icaza transferred trusteeship of her trust to Morgan Stanley. (Lutin Decl. ¶ 31.)

Plaintiff then sought to collect from Dragge either shares of SMIC stock or an equivalent value, under the terms of the 2007 Engagement. (Compl. ¶ 62.) On February 22, 2008, Dragge emailed Plaintiff confirming that he had terminated Plaintiff's services and only owed Plaintiff its earned monthly retainer. (Compl. Ex. O.)

Thereafter, in 2008, SMIC agreed to provide its shareholders with direct ownership of the company's AO Smith stock holdings. (Compl. ¶ 11.) This "constituted a significant benefit to each Defendant and to them all collectively and resulted from the services Plaintiff rendered, which services were designed to compel SMIC to agree to take these or similar actions to enhance the liquidity and value of SMIC shares." (Compl. ¶ 12.)

On December 3, 2010, Plaintiff issued Dragge a statement for $1,196,563.00, reflecting the amount owed under the 2007 Engagement. (Compl. ¶ 69.)

On June 10, 2011, Plaintiff instituted this action, which was removed to this Court on July 11, 2011.

## II. LEGAL STANDARD

A cause of action originally filed in state court may be removed to federal court by defendants when "the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a). "The propriety of removal thus depends on whether the case originally could have been filed in federal court." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 163 (1997).

District courts enjoy diversity jurisdiction where, assuming the requisite amount in controversy is met, the suit is between "citizens of different States." 28 U.S.C. § 1332(a)(1). It is well-established that such jurisdiction is proper only when there is "complete diversity," which does not exist if any plaintiff is a citizen of the same state of any defendant. St. Paul Fire and Marine Ins. Co. v. Universal Builders Supply, 409 F.3d 73, 88 (2d Cir. 2005).

Nonetheless, "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining as defendants parties with no real connection with the controversy." Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 460-61 (2d Cir. 1988). "[T]o show that naming a non-diverse defendant is a 'fraudulent joinder' effected to defeat diversity, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiff's pleadings, or that there is no possibility, based on the pleadings, that a plaintiff can state a

6

cause of action against the non-diverse defendant in state court." Id. at 461. "The defendant seeking removal bears a heavy burden of proving fraudulent joinder, and all factual and legal issues must be resolved in favor of the plaintiff." Id.

If Icaza is properly named, there is no diversity jurisdiction since both Plaintiff and Icaza are New York residents. (Compl. ¶¶ 2, 5.) Plaintiff seeks to remand the action on this basis. Icaza and the Dragge Defendants claim, however, that Icaza is not properly named, and that she was joined to destroy diversity. Plaintiff has no valid claim against Icaza and she must be dismissed.[1] "Thus, under Pampillonia . . . it is first necessary to evaluate [Icaza's] Motion to Dismiss . . . so as to determine if there is any possibility that [P]laintiff can state a cause of action against [Icaza] in state court." PSINet Liquidating LLC. v. Bear Stearns & Co., Inc., No. 02 Civ.6691(GBD), 2003 WL 367863, at *2 (S.D.N.Y. Feb. 19, 2003); see also Allied Programs Corp. v. Puritan Ins. Co., 592 F.Supp. 1274, 1276 (S.D.N.Y. 1984) (noting that a "plaintiff's efforts to prevent the removal of a case through such 'fraudulent' joinder will fall prey to [ ] the defendant's motion to dismiss the case" and holding that joinder is fraudulent when it is established that there can be no recovery against the defendant "on the facts in view of the law as they exist when the petition to remand is heard.")

"When assessing the legal viability of a plaintiff's claim in this context, courts employ a standard that is more lenient to plaintiffs than the standard for a motion to dismiss." Winters v. Alza Corp., 690 F. Supp. 2d 350, 353 (S.D.N.Y. 2010). Since subject matter jurisdiction is contested the Court is permitted to look to materials outside

---

[1] There is no dispute concerning the jurisdictional amount; Plaintiff seeks "no less than $1 million" in damages. (See Compl. Prayer for relief).

the pleadings,[2] including, inter alia, "documents appended to a notice of removal or a motion to remand that convey information essential to the [C]ourt's jurisdictional analysis."  Romano v. Kazacos, 609 F.3d 512, 520 (2d Cir. 2010) (considering a situation where a court rules simultaneously on motions to dismiss and remand).

### III. DISCUSSION

Icaza's arguments in her motion to dismiss are essentially the same as in her opposition to the motion to remand.  Plaintiff's breach of contract claim fails because there is no agreement between Plaintiff and Icaza; Icaza never assented to any agreement; and Icaza is not liable under an alter-ego theory under New York law.  Icaza argues that Plaintiff's quantum meruit and unjust enrichment claims are barred by the statute of frauds, the statute of limitations, by the terms of the 2007 Engagement, and because they are duplicative of the breach of contract claim.  Plaintiff's opposition arguments raise the same issues.  Accordingly, the Court will consider all the papers together in determining whether there is any possibility that Plaintiff can state a cause of action against Icaza in New York state court.

A. *Plaintiff's Breach of Contract Claim*

Icaza never signed the 2007 Engagement, nor any contract with Plaintiff, but Plaintiff asserts that Icaza is liable for breach of contract under (1) an alter-ego theory, and/or (2) an implied-in-fact contract theory.

   1. Alter-Ego

In Plaintiff's complaint, Plaintiff alleges that Dragge and the Smith Family Defendants, which include Icaza, John Does (1-10) and Jane Does (1-10), "exercised dominion and control

---

[2]  The complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

over the Trust Defendants." (See Compl. ¶¶ 7, 53, 54)  In Plaintiff's motion papers, Plaintiff alleges that Dragge and Icaza "are alter egos of the trusts." (Pl. Remand Br. 5.)  Courts have assumed that the veil of a trust can be pierced where complete domination of the trust has been shown.  See Smith v. S.E.C., 432 Fed. App'x 10, 13 (2d Cir. 2011) (stating that it "assume[s] that New York courts would allow the veil of a trust to be pierced in situations where the complete domination of a trust has been shown.").

To state a claim for alter-ego liability, Plaintiff must allege that (1) Defendant exercised complete domination with respect to the transaction attacked, such that the trust "had no separate will of its own," and (2) that this domination was used to commit a "fraud or wrong" against Plaintiff.  Marketplace LaGuardia Ltd. P'ship v. Harkey Enters., Inc., No. 07-CV-1003(CBA), 2008 WL 905188, at *2 (E.D.N.Y. Mar. 31, 2008) (quoting Am. Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir.1988)); see also Smith, 432 Fed. App'x at 13 (applying a parallel standard in analyzing a veil piercing claim with respect to a trust).

Focusing on the transaction attacked,[3] Plaintiff alleges that "Allen Dragge and the Smith Family Defendants exercised dominion and control over the Trust Defendants"[4] (see Compl. ¶¶ 53, 54) for the "improper purpose of knowingly and falsely misleading Plaintiff into providing services for the benefit of all defendants" (Compl. ¶ 59).  Plaintiff's factual allegations suggest that Dragge may have sought to control the Smith Family trust.  For example, Plaintiff alleges that its Plan involved changing the trustees of the Smith family trusts "so that the voting of their SMIC stock holdings would be controlled by Dragge through new trustees." (Lutin Decl. ¶ 18.)

---

[3] The Court assumes the transaction attacked includes the 2007 Engagement, Plaintiff's Plan and its related services.

[4] The "Trust Defendants" include John/Jane Doe Trusts (1-10) and the Allen O. Dragge Family Trust. (Compl. ¶ 8.)

Plaintiff fails to make similar allegations against Icaza.  Plaintiff does not allege when, where, or how Icaza, in any way, exercised complete domination over the Trust Defendants.  Nor does Plaintiff allege how Icaza used any such domination over the Trust Defendants to mislead Plaintiff.  Plaintiff also alleges that the John/Jane Doe Defendants "exercised dominion and control over the Trust Defendants", without specifying who, when, where and how any of these individuals did so, or how they used such domination to mislead Plaintiff.  In essence, Plaintiff "merely asserts that an undifferentiated group of 'defendants' conspired to defraud" Plaintiff, but such conclusory allegations "are insufficient to establish an alter-ego claim in New York."  Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 375 (S.D.N.Y. 1997); see also Bravado Intern. Grp., 655 F.Supp.2d at 197 (holding that where it "is unclear which defendant or defendants are alleged to have caused such harm. . . Plaintiffs' claim is . . . too vague and conclusory to allege alter ego liability.")

2. Implied-in-fact Contract and/or Ratification

Plaintiff asserts Icaza's liability for breach of contract under an implied-in-fact contract and/or ratification of the engagement.  (Pl. Remand Br. 7.)  "Under New York law, an implied-in-fact contract requires all of the elements required of any valid contract, including consideration, mutual assent, legal capacity, and legal subject matter."  Murray v. Northrop Grumman Info. Tech., Inc., 444 F.3d 169, (2d Cir. 2006) (citing Maas v. Cornell Univ., 94 N.Y.2d 87, 93-94 (1999)).  Icaza argues that she never assented to any such contract.  "The manifestation or expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract."  Leibowitz v. Cornell Univ., 584 F.3d 487, 507 (2d Cir.2009) (quoting Maffea v. Ippolito, 668 N.Y.S.2d 653, 654 (N.Y. App. Div. 2d Dep't 1998)).  "In determining whether the parties' conduct is consistent with the existence of

10

a binding contract, it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 97 (2d Cir.2007) (quoting H/R Stone, Inc. v. Phoenix Bus. Sys., Inc., 660 F.Supp. 351, 356 (S.D.N.Y.1987)).

Plaintiff alleges that "Icaza's email to Gary Lutin [o]n [April 24,] 2006 and her subsequent continued participation in the Plan, including but not limited to, her transfer of her trusts to Morgan Stanley demonstrated her assent to engage Plaintiff." (Pl. Remand Br. 8).

Icaza's April 24, 2006 email—thanking Lutin for "explain[ing] . . . the situation at hand and next steps"—was written during the course of Plaintiff's 2006 Engagement, for which it received payment in full. (See Compl. ¶¶ 23, 27, Ex. D.) Plaintiff alleges that while explaining "the situation at hand," Plaintiff told Icaza that Plaintiff's continued work would require a second engagement and that any participant in the implementation of the Plan would have to compensate Plaintiff. (Id. ¶ 12.) Plaintiff does not allege, however, that Icaza commissioned Plaintiff to continue its work, or assented to any offer by Plaintiff to continue work during this meeting or through her email. Rather, Plaintiff concedes that Dragge, not Icaza, asked Plaintiff to continue its work and that Icaza only became aware of this on May 17, 2006, weeks after her email. (Lutin Decl. ¶¶ 22, 23.) Accordingly, Icaza's April 24, 2006 email cannot demonstrate her assent to an agreement with Plaintiff that was made by another individual at a later date.

With respect to Icaza's participation in the Plan, Plaintiff alleges that it "advised and assisted" Dana Icaza in interviewing and replacing the trustees and that Icaza was "expected to be the family 'information-gathering delegate' in implementing the Plan." (Compl. ¶ 32; Lutin Dec. ¶¶ 24-28.) As to Icaza's role as the 'information-gathering delegate' however, Lutin conceded that he was "not actually involved in the family trust aspect of this . . . but wanted to

11

extend any courtesy that will help these people realize the full value of their investments." (Lutin Decl. Ex. B.)  In other words, Plaintiff's own conduct at the relevant time that suggests it's relation to Icaza in 2006 was out of "courtesy" and not a contractual obligation.

Similarly, Plaintiff's own words, in 2007, shows that no contractual relationship existed between Plaintiff and Icaza.  Plaintiff wrote:  "At least for now, you [Dragge], individually, will be the person I [Plaintiff] advise. . . . My responsibility . . . will be to advise only those with whom I have an agreement.  I will have no responsibility to serve the interests of anyone I have not specifically agreed to advise." (Compl. Ex. J.)  Further, Plaintiff clarified that Dragge would have to take some risks because it was in Dragge's interest to have all Smith family trust shareholders contribute to Plaintiff's compensation pro-rata, based on the value of their trusts enhancement, rather than leave Dragge "effectively penalized by the amount of costs you incur relative to the 'free riders.'"  (Id.)  Plaintiff's contemporaneous statements demonstrate that Plaintiff believed Icaza had neither assented to be advised by Plaintiff, nor agreed to compensate Plaintiff.

Considering the totality of the parties' alleged acts, and primarily Plaintiff's own words and conduct, Plaintiff has not stated a claim for an implied-in-fact contract because it has not shown that Icaza ever assented to the 2007 Engagement.

Ratification, under New York law, is "the affirmance by a party of a *prior* act that did not bind it at the time but that was done or purportedly done on its account."  In re Nigeria Charter Flights Contract Litig., 520 F. Supp. 2d 447, 465 (E.D.N.Y. 2007)(quoting Chemical Bank v. Affiliated FM Ins. Co., 169 F.3d 121, 128 (2d Cir.1999)(emphasis added).)  "Ratification 'must be performed with full knowledge of the material facts relating to the transaction, and the assent must be clearly established

and may not be inferred from doubtful or equivocal acts or language.' " Id. (quoting Chemical Bank, 169 F.3d at 128). After the 2007 Engagement was purportedly finalized in October 2007, Plaintiff alleges only that Icaza continued communications with the Smith family and caused her trust to be transferred to Morgan Stanley. These allegations are insufficient to show that Icaza had full knowledge of the terms of the 2007 Engagement and to "clearly establish" her assent to the 2007 Engagement. Accordingly, Plaintiff's ratification claim against Icaza fails.

The Court has analyzed Plaintiff's breach of contract claim against Icaza under a more lenient standard than that of a motion to dismiss, but nonetheless finds there is no possibility that Plaintiff can state claim for breach of contract against Icaza in state court.

*B. Plaintiff's Quantum Meruit and Unjust Enrichment Claims*

Icaza argues that Plaintiff's quantum meruit and unjust enrichment claims are barred by the statue of frauds. (Icaza Remand Opp. 11.)

The parties disagree over whether N.Y. Gen. Oblig. Law § 701(a)(1) or (a)(10) govern the statute of fraud analysis. The relevant provisions state:

> Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:
>
> 1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;
>
> 10. Is a contract to pay compensation for services rendered in negotiating . . . a business opportunity. . . . "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction. This provision shall apply to a contract implied in fact or in law to pay reasonable compensation . . . .

N.Y. Gen. Oblig. Law § 701(a)(1), (a)(10).

With respect to N.Y. Gen. Oblig. Law § 701(a)(10), the New York Court of Appeals has held that "[u]njust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under 'a contract implied . . . in law to pay reasonable compensation," which will be barred by the statute of frauds where the "compensation plaintiff seeks is 'for services rendered . . . in negotiating the purchase . . . of a business opportunity.'" Snyder v. Bronfman, 13 N.Y.3d 504, 508-09 (2009)(alterations in original). Negotiating a business opportunity includes providing services "such as: (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential business partners; (3) and being a "major contributor" to the eventual formation of the [business opportunity]." Gutkowski v. Steinbrenner, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010) (identifying the relevant factors from Snyder). The statute applies when plaintiff's services provide "connections," "ability," "knowledge," "'know-how' or 'know-who,' in bringing about between principals an enterprise of some complexity or an acquisition of a significant interest in an enterprise." Freeman v. Chemical Constr. Corp., 43 N.Y.2d 260, 267 (1977).

Plaintiff argues that § 701(a)(10) does not apply because it was not acting as a "finder" or "broker"; and its services involved more than just negotiating a business opportunity. Instead, it provided "wealth management advice and proposed a strategy to increase share value and compel corporate action." (Pl. Opp. MTD 11.) Plaintiff's factual allegations show that Plaintiff's services entailed: (1) devising and proposing a Smith Family Association (the "Association"), with Lutin as the director (Pl. Opp. MTD 11), and (2) devising, advising, and assisting in implementing its Plan to change the trustees of the Smith Family trusts (Lutin Decl. ¶ 18).

While Plaintiff alleges that the Association was a component of its Plan, it does not allege that it dealt with Icaza in developing this Association, or that Icaza benefited from any such Association. In fact, Plaintiff does not allege that the Association was ever created, or that Lutin ever served as a director. To the extent the Association was part of Plaintiff's Plan under the 2007 Engagement, the Court finds, for the reasons previously stated, that Icaza is not liable for any breach of the 2007 Engagement. Accordingly, any services contemplated by the 2007 Engagement that did not involve or benefit Icaza, are not relevant in determining whether Icaza is liable under a quantum meruit or unjust enrichment theory for the services Plaintiff purportedly provided her. See Snyder, 13 N.Y.3d at 509 (holding that where an oral agreement, to negotiate and *operate* a joint venture, was found to be invalid, any services contemplated in the oral agreement were irrelevant to determine whether plaintiff, through his unjust enrichment and quantum meruit claims, was seeking compensation for services that actually were limited to and negotiating a business opportunity).

Plaintiff alleges, however, that it did interact with Icaza, to her benefit, in providing services relating to changing trustees. Specifically, Plaintiff alleges that: it devised the plan to change trustees, in order to control and compel SMIC to take actions to enhance liquidity (Lutin Decl. ¶¶18, 19); it explained the situation to Icaza (Lutin Decl. ¶ 11); it assisted Icaza in interviewing potential trustees (Compl. ¶ 32); it assisted in the transitioning and administration of the change in trustees (Lutin Decl. ¶ 24); it assisted Dragge in 'pitching' the plan to Smith family members (Compl. ¶ 49); and that Icaza benefited from the change, which ultimately resulted in SMIC's agreement to give its shareholders a direct ownership in A.O. Smith (Compl. ¶ 12).

Plaintiff's services can thus be categorized as (1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential trustees; (3) and being a "major contributor" to the eventual formation of the new trustee relationship, which places its services directly within the realm of N.Y. Gen. Oblig. Law § 701(a)(10).  See Gutkowski, 680 F. Supp. 2d at 605-08, 613 (dismissing quantum meruit and unjust enrichment claims, pursuant to § 701(a)(10), based on an oral agreement, where plaintiff: "presented" an idea for defendant to create a Yankees television network; "explained the situation" to defendant, "suggest[ed] and detail[ed] certain specific steps to be taken next", analyzed potential strategic and financial partners, and served as a consultant during and after the business acquisition); Snyder, 13 N.Y.3d at 509 (affirming dismissal of quantum meruit and unjust enrichment claims, pursuant to § 701(a)(10), where plaintiff's actual services involved finding and negotiating the purchase of a business opportunity).  Therefore, Plaintiff's quantum meruit and unjust enrichment claims against Icaza are barred by the statute of frauds.  Accordingly, the Court finds there is no possibility that Plaintiff can state claims for quantum meruit and unjust enrichment against Icaza in state court.

*C. Request to Amend Complaint*

Plaintiff also seeks to amend its complaint to add a constructive trust claim.  (Pl. Remand Br. 10 n.1.)  Under Rule 15(a) of the Federal Rules of Civil Procedure, "[t]he court should freely give leave when justice so requires."  A court may deny leave to amend if the amendment would be futile, such as where the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  Lucente v. IBM Corp., 310 F.3d 243, 258 (2d Cir. 2002).

"In order to state a cause of action to impose a constructive trust, a plaintiff must allege (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance

thereon, and (4) unjust enrichment." Zane v. Minion, 63 A.D.3d 1151, 1152 (N.Y. App. Div. 2d Dep't 2009). Plaintiff has not shown that a confidential or fiduciary relationship between it and Icaza existed, or that Icaza made Plaintiff any promise, or any unjust enrichment to Icaza. Accordingly, Plaintiff's attempt to add a constructive trust claim against Icaza is futile.

*D. Motion for Costs and Expenses*

For the reasons above, the Court has diversity jurisdiction over Plaintiff's claims. Accordingly, there is no basis for Plaintiff's request to recover costs incurred as a result of the Dragge Defendants' removal.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion to remand is DENIED and Icaza's motion to dismiss is GRANTED. Icaza is, therefore, no longer a defendant in this action. The Clerk of the Court is directed to close these motions (Dkt. Nos.8, 11).

The remaining parties are directed to meet and confer and to prepare and submit a Civil Case Management Plan by December 2, 2011.

Dated: New York, New York
November 21, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge

17