USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 21 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRANSITION INVESTMENTS, INC.       :
                                   :
                 Plaintiff,        :
                                   :     11 Civ. 04775 (AJN)
       -v-                         :
                                   :     OPINION AND ORDER
THE ALLEN O. DRAGGE, JR. FAMILY TRUST, *et al.*, :
                                   :
                 Defendants.       :
------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

Plaintiff Transition Investments, Inc. brings this diversity action alleging breach of contract or, in the alternative, claims for unjust enrichment and *quantum meruit*, arising out of advice that Plaintiff provided Defendants as part of a shareholder struggle to change the business strategies employed by the Smith Investment Company from 2006 through 2008. Because the Court concludes that the agreement at issue, which was not signed by the party to be charged, involved services rendered in negotiating a business opportunity, and therefore falls within New York's Statute of Frauds, Defendants' motion to dismiss is GRANTED.

**I.     Standard of Review**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in favor of the non-moving party. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

## II.   Background

The following facts are taken from the Amended Complaint and its attachments and are assumed to be true for purposes of this motion. All of the Defendants in this case are descendants of the Smith family, as well as their trust funds, who owned shares, either directly or through their family trusts, in The Smith Investment Company ("SMIC"), a fund that in 2006 owned 31% of the equity shares in A.O. Smith Corporation ("AO Smith"). (FAC ¶¶ 5–11).

In approximately 2005 or early 2006, Allen Dragge and other Doe defendants were unhappy with SMIC's trustees, who the Defendants believed were channeling money towards non-profits operated by relatives rather than distributing the fund's profits to equity shareholders. (FAC ¶¶ 15–16). The Defendants were concerned that the action of SMIC's trustees was impairing SMIC's shareholder value. (FAC ¶ 16).

### A.   *The 2006 Agreement*

In light of these concerns, in March of 2006, Defendants contracted with Plaintiff Transition Investments, Inc. ("Transition") and its President, Gary Lutin, for a "limited exploratory engagement," for which Plaintiff was compensated $25,000 in return for providing advice regarding "potential value enhancement opportunities." (FAC ¶ 19–20). This review consisted of identifying "potential strategic or structural changes that could be implemented, either by management or by shareholders, to improve the liquidity and market pricing of Smith stock, or by other means enhance the realizable value of" SMIC's investment in AO Smith.

(FAC Ex. B ¶ 2). On April 26, 2006, Plaintiff delivered to Dragge a report suggesting that SMIC increase liquidity by divesting from two subsidiary operating companies and converting SMIC into a "pass through entity" that would pay out the dividends from AO Smith stock to SMIC's shareholders. (FAC ¶ 26; Ex. N). The report suggested that this goal be achieved either by obtaining existing management's agreement or, if necessary, by having SMIC shareholders vote to remove the existing directors and elect replacements. (FAC Ex. N). On June 5, 2006, Dragge, with the aid of his relatives, tendered full payment for these services. (FAC ¶ 30).

Around early May of 2006, SMIC's board of directors rejected the suggestions in Lutin's review. (FAC Ex. G). Dragge then told his family members that he had asked Lutin "to prepare suggestions for actions" that shareholders of SMIC might take to raise shareholder value, meaning a push to take over control of SMIC's board so that the changes suggested in the 2006 report would be implemented. (*Id.*).

B. *The Alleged 2007 Agreement*

Sometime in late 2006 or 2007, Dragge and Transition entered into discussions for a second engagement. (FAC ¶¶ 31–32, 37). On September 28, 2007, in an apparent attempt to formalize this arrangement, Lutin sent Defendant a draft engagement letter, which was twice revised (FAC Exs. H–J). Lutin sent Dragge the third and final proposed engagement letter on October 26, 2007 ("Final Proposed Engagement") (FAC Ex. J). The Final Proposed Engagement letter called for Lutin to create a "Preliminary Plan." (FAC Ex. J). Paragraph B of the proposed agreement provided that if Dragge deemed the Preliminary Plan "acceptable," Lutin was to receive what the proposed agreement characterized as "the equivalent of a carried interest payment": 10,000 shares of SMIC at $70.00 per share or "an acceptable alternative of equivalent

3

value." (*Id.*). In the Final Proposed Engagement, Lutin offered that "I will provide a discussion draft of the preliminary plan within a couple of weeks . . . ." (*Id.*).

The Final Proposed Engagement states that the Preliminary Plan "would include basic objectives and general strategies, with specific opening steps to be initiated upon" Dragge's determination that a number of the family trusts controlling SMIC are independent of then-current SMIC management. (Ex. J). Plaintiff further alleges that Lutin "guided Dragge's communications with family members to win their support" for a change in SMIC's leadership, including by helping Dragge's niece, Dana Icaza, "who had agreed to support the plan as a representative of family interests," draft questions and answers that were sent to other family members, "to help them understand the benefits of Plaintiff's plan to transfer control of their trusts." (FAC ¶ 48).

On November 1, 2007, five days after sending the 2007 Proposed Engagement, Lutin e-mailed Dragge to say "Not having heard back from you . . . I just wanted to check up to find out if all's well." (FAC Ex. L). Later that night, Dragge responded, writing that he was sending Lutin $5,000 "as a good faith payment pending final negotiation." (*Id.*). Plaintiff claims that receipt of this $5,000 constituted performance by Dragge pursuant to the Final Proposed Engagement that "induced Plaintiff to further perform" by e-mailing Dragge a proposal for the Smith Investor Association ("SIA"). (FAC ¶ 60–61).

Though the Amended Complaint does not detail the precise workings of the SIA,[1] at oral argument, counsel for Plaintiff accepted the Court's characterization that the proposed SIA was "a cost sharing mechanism . . . to pay Mr. Lutin for doing the work of advising on getting all the

---

[1] Lutin's November 21, 2007 proposal for the SIA can be found in Exhibit N to the FAC, which the Court may consider. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002).

4

family trusts in the same place . . . ." so that Dragge was not forced to pay Lutin entirely on his own. (3/22 Tr. at 36). There is no allegation that the SIA was ever established or that Lutin ever served as its director.

On November 24, 2007, Dragge informed Lutin via email that he had forwarded Lutin's proposal for the SIA to Sandra Lambert, Dragge's then-fiancée, and George Nicol of Morgan Stanley. (FAC Ex. N). Dragge explained to Lutin that he values those individuals' opinions and indicated that he was forwarding them the plan to obtain their input. (*Id.*). Plaintiff alleges that these emails indicate that Dragge "accepted and undertook to proceed with the" Preliminary Plan. (FAC ¶¶ 62–64).

On or about January 31, 2008, SMIC's board members decided to implement changes that Dragge determined obviated the need to employ Lutin's "adversarial" approach. (FAC ¶ 73; Ex. N–O). On February 3, 2008, Dragge sent Lutin an email stating "we won!" and describing the board's "stunn[ing]" reversal. (*Id.*). These changes were implemented in December of 2008. (FAC ¶¶ 12, 79).

        C.    *Disagreement Between Lutin and Dragge*

Attachments to the FAC do not include communications between Lutin and Dragge from February 4, 2008 through February 10, 2008. On February 11, 2008, Dragge e-mailed Lutin, "I disagree with your approach . . . . I appreciate your efforts, support, and encouragement . . . . However, as I told you last Tuesday . . . I am not interested in pursuing a discussion" of the suggestion that Dragge take "an adversarial approach to assuring the changes the Board has just now voluntarily adopted." (FAC Ex. O).

Dragge went on to write, "I believe it would be the gentleman's approach, since the Board arrived at this voluntarily, for you to forego the 45 days notice of termination. However,

should you insist on it, I will pay the remaining $5,000." (FAC Ex. O). Dragge added, "Let's be clear, you are not entitled to any other compensation and disappointing though it may be, you know this is a risk in your business and why you typically ask for such a big chunk of money when you do earn a fee." (*Id.*).

### III. Procedural History

Three and one half years after this falling out, on June 11, 2011, Plaintiff filed its complaint in New York Supreme Court seeking $1,196,563 in damages. Plaintiff's original complaint named the Dragge Fund, Dragge himself, Dragge's niece Dana Icaza, and Jane and John Does. On July 11, 2011, Defendant removed to federal court and the case was assigned to Judge Crotty. (Docket #1).

On November 21, 2011, Judge Crotty dismissed the complaint against Icaza, who Defendants alleged had been fraudulently joined to defeat diversity. (Dkt # 19). Judge Crotty held that any agreement between Plaintiff and Icaza fell within the realm of New York's Statute of Frauds and, because there was no signed agreement, Plaintiff's allegations against Icaza were barred. *Transition Investments, Inc. v. Allen O. Dragge, Jr. Family Trust*, 2011 WL 5865149, at *9 (S.D.N.Y. Nov. 21, 2011).[2] Judge Crotty assessed the services that Plaintiff allegedly provided to Icaza as, "(1) identifying and analyzing the business opportunity; (2) identifying and analyzing potential trustees; (3) and being a major contributor to the eventual formation of the new trustee relationship." *Id.* at 9 (internal quotation marks omitted). Judge Crotty found that these services were "directly within the realm" of New York's Statute of Frauds, thereby precluding Plaintiff from being able to state a claim against Icaza. *Id.*

---

[2] Notably, Icaza was not involved with the Final Proposed Engagement and Judge Crotty held that none of its contents, including the SIA, were attributable to her. *Id.* at *8.

6

After dismissing the claims against Icaza and denying Plaintiff's motion to remand, Judge Crotty instructed Plaintiff to amend its complaint prior to the motion to dismiss if it intended to do so at all. (Docket #'s 21–22). The Amended Complaint was submitted on January 17, 2012. (*Id.*). The instant motion to dismiss was filed on February 3, 2012, and the case was thereafter reassigned to the undersigned Judge.

### IV.  Statutory Background

Critical to the outcome of this case is whether the agreement between Dragge and Lutin, captured in the Final Proposed Engagement letter that was signed by Lutin but not Dragge, falls within New York's Statute of Frauds. New York General Obligations Law § 5-701(a)(10) states that "every agreement, promise, or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith . . . if such agreement, promise or undertaking . . . [i]s a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate interest therein, or of a business opportunity, business, its good will, investor, fixtures or an interest therein . . . ." "Negotiating" is defined to include "procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of the transaction." N.Y. Gen. Obl. Law § 5-701(a)(10).

The New York Court of Appeals has read § 5-701(a)(10) broadly to cover "services rendered in negotiating a business opportunity." *Freedman v. Chem. Constr. Corp.*, 43 N.Y.2d 260, 267 (1977); *see also Snyder v. Bronfman*, 13 N.Y.3d 504, 509 (2009). "The reach of § 5-701(a)(10) is to be decided on a case-by-case basis." *Tower Int'l Inc. v. Caledonian Airways, Ltd.*, 133 F.3d 908, 1998 WL 3614, at *2 (2d Cir. Jan. 8, 1998). "[C]areful pleading is required

to overcome the heavy burden created by the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG v. Aegis Grp. PLC*, 93 N.Y.2d 229, 236 (1999).

      Two recent opinions, one by the New York Court of Appeals and the other by Judge Sullivan in this District, illustrate the broad application of § 5-701(a)(10). In *Snyder v. Bronfman*, the New York Court of Appeals held that § 5-701(a)(10) applied where the plaintiff "devoted years of work to finding a business to acquire and causing an acquisition to take place" in reliance on an oral agreement. *Snyder*, 13 N.Y.3d at 509 (2009). In that case, the agreement was that the plaintiff "would function as the defendant's experienced right hand, sounding board, loyal ally, principal advisor, and most importantly, his consigliere." *Id* (internal quotation marks omitted). The plaintiff "developed for the Joint venture a series of business relationships" and the defendant assured plaintiff orally that he would be able to share in the proceeds of a consummated transaction. *Id.* at 506–07. Still, the Court of Appeals, while acknowledging that the plaintiff "was a major contributor to [the deal's] success," held that the conduct alleged constituted negotiating a business opportunity and the claim was therefore barred by § 5-701(a)(10). *Id.* at 507.

      Applying *Snyder*, Judge Sullivan in this District held that § 5-701(a)(10) barred a claim in circumstances where the plaintiff (1) identified and analyzed the business opportunity, (2) identified and analyzed potential business partners, and (3) was a "major contributor" to the eventual formation of the enterprise. *Gutkowski v. Steinbrenner III*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010). Specifically, the plaintiff in *Gutkowski* informed the defendant that he was analyzing potential strategic and financial companies as equity and distribution partners, identifying key decision-makers at such companies, and developing a detailed financial *pro*

*forma. Id.* at 606. All of these services were held to fall within the realm of New York's Statute of Frauds. *Id.* at 613.

This body of § 5-701(a)(10) case law has already been analyzed within the context of the present case by Judge Crotty, who applied *Snyder* and *Gutkowski* in dismissing the claims against Defendant Icaza. *Transition*, 2011 WL 5865149, at *8–9. Judge Crotty found that Plaintiff assisted Icaza by devising the plan to change trustees of SMIC, explaining the situation to Icaza, assisting Icaza in interviewing potential trustees, assisting in the transitioning and administration of the change in trustees, and assisting in "pitching" the plan to Smith family members. *Id.* at 9. Judge Crotty held that these services fell "directly within the realm of" § 5-701(a)(10). *Id.*

### V. Discussion

#### A. The Agreement is Within the Statute of Frauds

The Amended Complaint alleges that Plaintiff performed the following services: assisted Dragge and Icaza in developing questions and answers to allay their relatives' concerns regarding consolidation of trust accounts with a trust administrator independent from the SMIC Board, provided guidance and support to Dragge, counseled Dragge on how to wage a campaign against entrenched SMIC trustees and their supporters, and proposed the SIA as a mechanism to provide Plaintiff with compensation for these services. (FAC ¶ 48, Ex. N).

With the exception of the proposal of the SIA, Judge Crotty has already held that all the other services provided by Lutin fall within the realm of the Statute of Frauds. *Transition*, 2011 WL 5865149, at *9. Judge Crotty's opinion is law of the case, which, while this Court certainly has the ability to reverse, ought to remain the governing law of this case because it was correctly

decided.[3] Other than the SIA, the services that Plaintiff allegedly performed for Defendants consisted of helping Dragge with the communication and the pitch to his family, assessing proposed trustees for SMIC, and "advising Dragge on how to effectuate corporate governance reforms and how to then enable him to rally the troops of his family going forward." (3/22 Tr. at 31–38). This is precisely the kind of "know how or know who" by a "sounding board, loyal ally, [and] principal advisor" discussed by the New York Court of Appeals in *Snyder*, and the undersigned Judge fully adopts Judge Crotty's determination that these services fall within the realm of § 5-701(a)(10).

At oral argument, Plaintiff acknowledged that Judge Crotty has already determined that the majority of services that the Amended Complaint alleges Plaintiff provided to Defendant are covered by § 5-701(a)(10). (3/22 Tr. at 28–36). When asked repeatedly to specify services Plaintiff provided to Dragge or any other Defendants that were beyond the scope of those already determined by Judge Crotty to fall within the realm of the Statute of Frauds, counsel for Plaintiff identified only the SIA. (3/22 Tr. at 28–34).

Yet, as counsel for Plaintiff conceded at oral argument, the SIA was a cost-sharing mechanism for making sure that Lutin was compensated for services that Judge Crotty has already held amounted to assisting in negotiating a business opportunity. (3/22 Tr. at 36). The SIA was simply a payment structure to compensate Plaintiff for services that fall within the realm of the Statute of Frauds. The mechanism by which payment of services was to be effected did not alter the substance or underlying nature of the agreement. Because the agreement at

---

[3] The doctrine of law of the case is especially strong where, as here, "the judges in a case are switched mid-stream . . . . [T]he successor judge may not reconsider [her] predecessor's rulings with the same freedom that [s]he may reconsider [her] own rulings." *L-3 Commc'ns Corp. v. OSI Sys., Inc.*, 2007 WL 576124, at *5 (S.D.N.Y. Feb. 23, 2007) (quoting *Rite Aid Corp. v. Home Prods. Corp.*, 2003 WL 21250547, at *4 (E.D.N.Y. Apr. 16, 2003)).

issue was for negotiation of a business opportunity, it falls within § 5-701(a)(10) regardless of the payment mechanism employed.

        B.   There are No Writings Sufficient to Remove any Agreement From the Statute of Frauds

Plaintiff argues in the alternative that "there are sufficient writings here to satisfy the Statute of Frauds." (Opp. Br. at 9–11; *see also* 3/22 Tr. at 39–55). Plaintiff offers three legal theories to argue that five emails sent by Dragge to Lutin between November 2007 and February 2008 remove the case from the Statute of Frauds or, at the least, create a factual dispute as to whether the Statute of Frauds applies rendering dismissal inappropriate at this stage of the litigation. For the reasons outlined below, the Court is not persuaded by any of these arguments.

        i.   Plaintiff has Failed to Plead Written Acceptance

Plaintiff argues that Dragge's November 2, 2007 email informing Lutin that Dragge was sending $5,000 "as a good faith payment pending final negotiations" constitutes written acceptance by Dragge of Lutin's October 26, 2007 Final Proposed Engagement. (Opp. Br. at 9–10; 3/22 Tr. at 47). After Lutin followed up via email on his recent forwarding of the 2007 Final Proposed Engagement letter, Dragge responded in an email dated November 2, 2007, which stated in its entirety:

> sorry, but things got a little sentimental with the auction of my mother's furniture – the final outcome was good for all of us and my brother and I had a 'brotherly' time of it – we discussed your 'terms' but it was secondary to the more immediate events surrounding the auction.
>
> **as promised, I am sending you $5,000 today via my Wells Fargo online banking as a good faith payment pending final negotiations – hopefully we can talk tomorrow** (or as it is now 'today' for you) – if not tomorrow, then Sunday?
>
> Allen

11

(Ex. L) (emphasis added).[4]

Plaintiff's argument that this e-mail can be read as written acceptance by Dragge of the October 26, 2007 Proposed Engagement is without merit. Under New York law, acceptance must "be clear, unambiguous and unequivocal." *Krumme v. WestPoint Stevens, Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) (citing *King v. King*, 617 N.Y.S.2d 593, 594 (App. Div. 1994)); *Callahan v. Credit Suisse (USA), Inc.*, 2011 WL 4001001, at *5 (S.D.N.Y. Aug. 18, 2011). A writing that does not meet this standard "does not constitute a valid acceptance." *King*, 617 N.Y.S.2d at 594. The test for acceptance is based on an objective assessment of the offeree's words and actions independent of the individual's subjective intentions. *See Dodge Street LLC v. Livecchi*, 32 Fed. Appx. 607, 611 (2d Cir. 2002); *see also Asesores y Consejeros Aconsec CIA, S.A. v. Global Emerging Mkts. of N. Am., Inc.*, --- F. Supp. 2d ---, 2012 WL 86342, at *4 (S.D.N.Y. Jan. 11 2012).

Plaintiff's argument, at best, is that there is ambiguity as to whether Dragge's November 2, 2007 email constitutes acceptance, which Plaintiff argues creates an "issue of fact" that "takes this out of a motion to dismiss." (3/22 Tr. at 49 ("Our argument here is that on its face this is ambiguous.")).[5] This is insufficient to meet the standard for acceptance under New York law. Even accepting all reasonable inference in favor of the Plaintiff, nothing in the November 2, 2007 email expresses any clear or unambiguous willingness by Dragge to be bound to the terms

---

[4] The Court may consider attachments to the Complaint. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[5] At oral argument, the Court asked, "Good-faith payment pending final negotiations. So you think this does it with respect to agreement to the October 26, 2007 letter?" Plaintiff's counsel responded "We believe that it is sufficient on this motion to dismiss." (3/22 Tr. at 47). Plaintiff's counsel argued that "pending final negotiation" meant "the same thing that it means in the October 26, 2007 letter. In that letter, Gary Lutin himself writes that this is not perfect. This is subject to change. We will deal with the terms of this agreement, unless we come up with terms that are better and we can remain flexible. But unless and until we decide on something new, these will control for now, and then we will decide on something new, if we do, and that will be in writing." (3/22 Tr. at 45–46).

12

of the October 26, 2007 Final Proposed Engagement. Because Dragge's November 2, 2007 email "does not contain a positive, unequivocal and unqualified acceptance of" Lutin's Proposed Engagement, it cannot be deemed acceptance as a matter of law. *See King*, 617 N.Y.S.2d at 594.

        ii.        Plaintiff has Proffered No Admissions by Dragge That Remove the Case from the Statute of Frauds

Plaintiff also argues that in a February 11, 2008 email, "Dragge admits to entering the engagement." (Opp. Br. at 9). In that email, Dragge wrote to Lutin, "I no longer wish to engage your services and provided notice of termination last Tuesday." (Ex. O). In that same email, Dragge denied that he ever agreed to terms such as those contained in the October 26, 2007 Proposed Engagement.[6] Plaintiff did not cite any legal authority for its argument regarding "admission." Under New York law, a case may be removed from the Statute of Frauds when there is an admission "regarding the precise terms of the alleged agreement . . . ." *See Spencer Trask Software and Info. Serv. LLC v. RPost Int'l, Ltd.*, 383 F. Supp. 2d 428, 451 n.9 (S.D.N.Y. 2003); *Am. Talent Agency, Inc. v. Joe Fletcher Presents*, 2008 WL 4155654, at *5 (S.D.N.Y. Sept. 9, 2008) ("[A] party's admission to the essential terms and actual existence of the alleged oral contract is sufficient to take the agreement outside the scope of the Statute of Frauds.") (quoting *Dzek v. Desco Vitroqlaze of Schenectady Inc.*, 727 N.Y.S.2d 814, 816 (App. Div. 2001)); *see also Williams v. Lynch*, 666 N.Y.S.2d 749, 751 (App. Div. 1997).[7] The February 11, 2008 email nowhere mentions certain key terms, such as the services that were to be provided as

---

[6] In the February 11, 2008 email, Dragge wrote to Lutin, "I also believe I made it absolutely clear that our financial arrangement, and our only financial arrangement: the $5,000/month stipend for 4 months, or terminating earlier on 45 days notice, was over and done. I was and remain quite definite that is the case." (Ex. O) (emphasis in original).

[7] Section 5-701(b)(3)(c) also provides that an agreement is removed from the Statute of Frauds when "[t]he party against whom enforcement is sought admits in its pleading, testimony or otherwise in court that a contract was made." *See Holender v. Cammann Prods., Inc.*, 434 N.Y.S.2d 226 (App. Div. 1980). Defendants have not made any such admission in their "pleading, testimony or otherwise in court" and this exception is therefore inapplicable.

part of any agreement. Nor does this email reference any agreement that Dragge would pay Lutin the equivalent of a carried interest payment if Dragge accepted the Preliminary Plan, which is what Lutin had proposed in his October 26, 2007 letter. Because this email does not contain an acknowledgement or admission by Dragge as to essential terms of the alleged agreement, it is insufficient as a matter of law to remove the case from the Statute of Frauds.[8]

          iii.    The Writings Proffered by Plaintiff Fail to Remove the Case from the Statute of Frauds Under the *Crabtree* Doctrine

At oral argument, Plaintiff cited *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55 (1953), which holds that New York law does not require a contract to be contained in one document, but instead "may be pieced together out of separate writings, some signed, others not, connected with one another either expressly or by internal evidence of subject matter and occasion." (3/22 Tr. at 41). Importantly, however, under *Crabtree*, while unsigned writings may be considered, "at least one writing, the one establishing a contractual relationship between the parties, must bear the signature of the party to be charged, while the unsigned document must on its face refer to the same transaction as that set forth in the one that was signed." *Id.* at 56; *see also Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 11 (2d Cir. 1989) (stating that a "strict threshold requirement" of *Crabtree* is that the "signed writing must itself establish a contractual relationship between the parties").

---

[8] At oral argument, Plaintiff argued that Dragge made another "admission" in an email contained in Exhibit N to the Amended Complaint, which Dragge sent to his relatives at 6:00 PM on February 4, 2008. (3/22 Tr. at 54). Plaintiff alleged that an "admission" occurred when Dragge wrote to his family, "As most of you know, I invested a lot of time and money over the past two years to get this proposal, first for a professional recommendation of the restructuring, and then to get control of my family's voting rights in order to encourage current management's adoption of the recommendation." (*Id.*). This email is insufficient to serve as an "admission" for the same reason—it does not admit to the existence of an agreement between Dragge and Lutin or to any terms of such agreement. *See Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 2007 WL 2981949, at *4 (S.D.N.Y. Oct. 10, 2007). Specifically, it does not admit to an agreement to pay Lutin the equivalent of a carried interest payment upon acceptance of the Preliminary Plan.

Yet Plaintiff claims that the document constituting the contractual agreement is the Final Proposed Engagement (FAC ¶¶ 95, 98), which Dragge never signed. (Ex. J.; 3/22 Tr. at 46–57; *see also Transition*, 2011 WL 5865149, at *2). Plaintiff proffers five other emails electronically signed by Dragge, but even accepting all reasonable inferences in Plaintiff's favor, none established a contractual relationship and therefore none can satisfy the *Crabtree* test.

The first writing proffered by Plaintiff is the previously discussed November 2, 2012 email from Dragge to Lutin. The e-mail responds to Lutin's following up on the October 26, 2007 Proposed Engagement and advises that Dragge will pay Lutin $5,000 "pending final negotiation." (3/22 Tr. at 46; FAC Ex. L). Second, there is a January 7, 2008 email from Dragge to Lutin stating "I sent your stipend as soon as I had an internet connection . . . ." (3/22 Tr. at 50; FAC Ex. N). Third, there is a February 3, 2008 email from Dragge to Lutin stating "we won!" following a conversation where, as Dragge described it, SMIC's board "essentially read back to me almost verbatim the proposal we had made to the Board 2 years ago as having just been adopted . . . ." (3/22 Tr. at 51; FAC Ex. N). Fourth, there is a February 4, 2008 email from Dragge to Lutin following up on this decision by SMIC's board stating "this is as much if not more your triumph as it is mine!!!" (3/22 Tr. at 52; FAC Ex. N). And finally, there is a February 11, 2008 email from Dragge to Lutin stating, "I believe that it would be the gentlemen's approach, since the board arrived at this voluntarily, for you to forego the 45 days notice of termination." (3/22 Tr. at 55; FAC Ex. O).[9]

---

[9] To the extent that Plaintiff contends that these e-mails bolster the "factual dispute" as to whether Dragge "accepted" the October 26, 2007 Proposed Engagement, the Court is not persuaded because Plaintiff alleges that Dragge's written acceptance of the Engagement is found in his November 1, 2007 email, which the Court has already found is insufficient to constitute acceptance as a matter of law. No reasonable inference can be drawn from these additional emails that would alter that legal conclusion.

While "*Crabtree* permits the use of a confluence of memoranda, the minimum condition for such use is the existence of one [signed] document establishing the basic, underlying contractual commitment." *O'Keeffe v. Bry*, 456 F. Supp. 822, 829 (S.D.N.Y 1978). But Plaintiff does not argue that any of these signed e-mails establish a basic, underlying contractual commitment. Instead, Plaintiff argues for the Court to adopt an inverted application of the *Crabtree* doctrine. (*See, e.g.*, 3/22 Tr. at 39). *Crabtree* allows for an agreement to be removed from the Statute of Frauds if there is a signed writing establishing a contractual relationship. *Crabtree*, 305 N.Y. at 55. Related, unsigned writings can be used to fill in the missing terms so long as they clearly reference the signed, written agreement. *Id.* In this case, the written agreement laying out all of the terms is the Final Proposed Engagement, which Dragge *never signed*. Plaintiff in effect argues that the Court should graft Dragge's signature from other emails that Dragge signed electronically—none of which establish a contractual relationship—onto the Final Proposed Engagement because those emails allegedly reference Lutin's proposed contract. But this is an incorrect understanding of what *Crabtree* and its progeny permit.[10]

The Court is not persuaded by Plaintiff's argument that "there is an issue of fact that must be resolved before application of the Statute of Frauds." (3/22 Tr. at 55). Because the emails presented by Plaintiff fail on their face and as a matter of law to establish either acceptance by Dragge of the Final Proposed Engagement, an admission by Dragge of such acceptance, or a writing establishing a contractual relationship signed by Dragge, there is no legal doctrine presented by Plaintiff or known to the Court that can remove this case from the Statute of Frauds

---

[10] The Court's decision is not affected by *NYRU, Inc. v. Forge Restaurant, LLC*, 938 N.Y.S.2d 306 (App. Div. 2012). *NYRU*, a summary judgment opinion that does not detail the facts upon which it was premised, relied on *Crabtree*, which requires that at least one writing, "the one establishing the contractual relationship between the parties," be signed by the party to be charged. *Crabtree*, 305 N.Y. at 55–56. Because no such writing exists in the present case, *NYRU* offers Plaintiff no aid.

16

based on the facts pleaded and the documents attached to the Complaint, even assuming all of Plaintiff's allegations as true and construing any alleged factual questions in Plaintiff's favor.

****

While it is arguably true that the emails pointed to by Plaintiff create some circumstantial evidence suggesting that there existed an oral or otherwise unsigned agreement between Dragge and Lutin, the existence of such an agreement is not the issue. Nor is it relevant that Lutin may have provided services that greatly enriched Defendants and was not compensated as he believed he would be. The issue is whether the alleged agreement, which falls within the Statute of Frauds, was signed in writing by the party to be charged. Plaintiff's Complaint and its exhibits do not allege that there was an agreement signed by Dragge establishing a contractual relationship and, as a result, the breach of contract claim must be dismissed.[11]

## VI. Equitable Claims

Section 5-701(a)(10)'s requirement of a written agreement signed by the party to be charged applies to claims for unjust enrichment and *quantum meruit* as well. *Snyder*, 13 N.Y.3d at 508–09. Plaintiff argues that even if its breach of contract claim is barred by the Statute of Frauds, there are sufficient facts pleaded for the *quantum meruit* claim to survive. (3/22 Tr. at 63). In support of this position, at oral argument Plaintiff cited *Vioni v. Am. Capital Strategies Ltd.*, 2009 WL 174937 (S.D.N.Y. Jan. 23, 2009), a case in which Judge Crotty dismissed a

---

[11] Plaintiff's argument that "the agreement is outside the Statute of Frauds because the Dragge Defendants' actions constituted partial performance unequivocally referable to the" Final Proposed Engagement (Opp. Br. at 8) is also unavailing because "Section 5-701(a)(10) does not expressly provide a partial performance exception, and the New York Court of Appeals has firmly stated that there is no such exception." *Belotz v. Jefferies & Co., Inc.*, 213 F.3d 625, 2000 WL 665564, at *2 (2d Cir. May 22, 2000); *see also Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC*, 93 N.Y.2d 229, 237 (1999) (stating that "the conduct of the entity seeking to enforce the Statute of Frauds is always irrelevant.").

17

breach of contract claim as barred by the Statute of Frauds but allowed the *quantum meruit* claim to survive past the pleading stage.

Though not discussed or cited by either party, Judge Crotty's decision in *Vioni* relied on the doctrine set forth by the New York Court of Appeals in *Cohon & Co. v. Russell*, 23 N.Y.2d 569 (1969). In *Cohon*, there was a signed writing identifying the parties to the contract and the subject matter of the agreement, and establishing that the plaintiff had in fact performed. *Cohon*, 23 N.Y.2d at 574–75. "Standing alone, [the writing] constitute[d] an admission by the defendant that plaintiff performed services and that an obligation to plaintiff actually existed." *Id.* at 575. The *Cohon* court noted that the Statute of Frauds "was designed to guard against the peril of perjury" and concluded that in that case "the peril of perjury is largely, if not entirely, absent." *Id.* at 574.

Significantly, the *Cohon* Court was clear that "we do no violence to the well-established rule that in a contract action a memorandum sufficient to meet the requirements of the Statute of Frauds must contain expressly or by reasonable implication all the material terms of the agreement, including the rate of compensation if there has been agreement on that matter." *Cohon*, 23 N.Y.2d at 575. *Cohon* held only that in a *quantum meruit* claim, "if it does not appear that there has been an agreement on the rate of compensation, a sufficient memorandum [to make out a claim] need only evidence the fact of plaintiff's employment by defendant to render the alleged services. The obligation of the defendant to pay reasonable compensation for the services is then implied." *Id.* at 575–76. Thus, a *quantum meruit* claim can survive when there is a written document, signed by the party to be charged, detailing all of the terms except for

compensation. *Koch v. Multipan, Inc.*, 2001 WL 210004, at *5 (S.D.N.Y. Feb. 16, 2001) (*Cohon* articulates an "all but the compensation standard") (McMahon, J.).[12]

In this case, the signed documents proffered by Plaintiff fall far short of the *Cohon* standard. The only document that could be considered a complete or near-complete agreement is the October 26, 2007 Final Proposed Engagement, which Dragge did not sign. Dragge's emails to Lutin on January 7, February 3, February 4, and February 11, 2008, may be read as referencing a previous agreement, but no set of reasonable inferences permits them to morph into agreements in and of themselves. Additionally, none of them indicate an agreement by Dragge to pay Lutin the equivalent of a carried interest payment upon approval of the Preliminary Plan. These emails, far from containing an entire agreement save for the compensation term, do not provide anything resembling the outlines of an agreement. They fail to "establish clearly the existence of the alleged . . . agreement and its subject matter." *Springwell Corp.*, 16 F. Supp. 2d at 305. Plaintiff's *quantum meruit* claim therefore is barred by the Statute of Frauds.

*Cohon* was a case in *quantum meruit*, but the Second Circuit has applied it to actions for unjust enrichment as well. *Tower Int'l Inc. v. Caledonian Airways, Ltd.*, 133 F.3d 908, 1998 WL 3614, at *3 (2d Cir. Jan. 8, 1998). As a result, Plaintiff's unjust enrichment claim is also barred by the Statute of Frauds.

---

[12] Some courts have applied *Cohon* slightly beyond the "all but the compensation standard," causing then-Judge Sotomayor to opine that *Cohon* "leaves some ambiguity as to whether, to sustain a *quantum meruit* action, the writing relied upon must contain all essential terms of the contract but the rate of compensation, whether it must further contain an acknowledgment by the defendant of the plaintiff's performance, or whether it need only 'evidence the fact of plaintiff's employment by defendant to render the alleged services.'" *Springwell Corp. v. Falcon Drilling Co. Inc.*, 16 F. Supp. 2d 300, 305 (S.D.N.Y. 1998). Still, then-Judge Sotomayor noted that "courts have, at a minimum, required the writing relied upon to establish clearly the existence of the alleged . . . agreement and its subject matter." *Id.*

**Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED. The Complaint is dismissed with prejudice "as the statute of frauds . . . infirmit[y] discussed above render[s] futile any proposed amendment." *Gutkowski*, 680 F. Supp. 2d at 615. The Clerk of Court shall close Docket Number 23 and this case shall be closed.

SO ORDERED:

Dated: May 21, 2012
New York, New York

_____
ALISON J. NATHAN
United States District Judge